IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

TERRI JEAN DEAN, )
 )
       Plaintiff, )
 )
vs. ) Case No. 11-0001-CV-W-ODS
 )
MICHAEL J. ASTRUE, )
Commissioner of Social Security. )
 )

## ORDER AND OPINION AFFIRMING COMMISSIONER'S FINAL DECISION DENYING BENEFITS

Pending is Plaintiff's request for review of the final decision of the Commissioner of Social Security denying her applications for disability and supplemental security income benefits. The Commissioner's decision is affirmed.

## I. BACKGROUND

Plaintiff was born in July 1959, has a high school education, and has prior work experience as a packer, cashier, production assembler, and order filler. She filed a claim for benefits under Title II in July 2006, alleging she became disabled on November 1, 2003, due to a combination of Erb's Palsy, obesity, pain, and anxiety. Her insured status expired on June 30, 2009.

      The last doctors Plaintiff saw before her alleged onset date were at the Odessa Medical Clinic. She last obtained treatment there in August 2000 to obtain a refill of Fioricet, a codeine-based painkiller. R. at 262. The next record of a doctor's visit is from February 2004, when she saw Dr. Russell Thornton complaining she pulled a muscle in her neck. She was prescribed Relafen, Robaxin, and Vicodin and instructed to perform stretching exercises. R. at 278. Plaintiff returned in September 2004 seeking refills of Tylenol with codeine, and again in January 2005 to obtain a refill of Fioricet and to have a physical. R. at 277. During the physical, it was noted that

Plaintiff's "[e]xtremities are strong and well developed" and her chest x-ray was negative (although there was evidence of smoking). Plaintiff complained of headaches, reporting that "she has had multiple treatment and tests for these headaches and without any relief. She states it always comes down to stress." No tests were performed; instead, Plaintiff's Fioricet prescription was refilled. R. at 276. In late March, Plaintiff reported increased anxiety and stress because her daughter was caught robbing a convenience store; her Fioricet was refilled and she was also prescribed Xanax. R. at 273. Plaintiff returned one week later, reporting her daughter stole the Xanax and asking for a replacement prescription; her request was denied. She returned on April 26 to obtain refills for her medication (including Xanax and Fioricet), but was warned that a replacement for Fioricet had to be found. Plaintiff was also advised to get a job. R. at 271-72.

On May 20, 2005, Plaintiff complained about eczema, anxiety, and headaches. Plaintiff requested a refill of Xanax, but Dr. Thornton declined to prescribe it; instead, he increased her dosage of Effexor. Plaintiff requested a refill of Fioricet, and Dr. Thornton expressed concern, saying "I have also had a long discussion with her about the Fioricet in the past. I think she takes too much." Nonetheless, he agreed to prescribe Fioricet after limiting the amount she took per day and per week, recommending a neurology consultation, and warning her that he "would not keep her on this long term." R. at 270. Plaintiff returned on June 3 and saw Dr. Thornton's nurse, complaining of anxiety and nerves. The nurse "talk[ed] with her at great length that she needs to have a reevaluation for her headaches by a neurologist. She states that she ha[d] seen a neurologist a couple of years ago." Plaintiff indicated she would try to bring the neurologist records to the next visit. R. at 268. Plaintiff's last visit to Dr. Thornton's office was in mid-July with complaints of gastroenteritis, R. at 267; Plaintiff never produced the neurologist's records.

On March 13, 2006, Plaintiff went to Family Health Medical Practice in Lexington, Missouri, to establish care. Her chief complaint at that time was a cold and congestion; she was diagnosed as suffering form acute bronchitis. Plaintiff reported being on Klonapin (for anxiety) and Fioricet for migraines (among other medications) and needed

2

refills (which were prescribed). Plaintiff reported that she had previously had a CT scan prior to the diagnosis of migraines. The doctor also suggested having a chest x-ray. R. at 322-23. Plaintiff returned regularly to get more refills until her last visit on December 22, 2006. During these visits, the doctor also encouraged Plaintiff to lose weight and stop smoking[1] to help alleviate her coughing. R. at 317-21. On December 4, 2006 – the penultimate visit – Plaintiff complained of back pain and requested a physical be performed so she could use it as part of her disability appeal. The doctor indicated her back pain was due to her weight, which she needed to reduce; the doctor also refused to "prescribe her Klonapin due to misuse in the past." The nature of the misuse is not apparent. The doctor also declined to perform a physical for her disability appeal, and instead referred her to the Division of Family Services. R. at 318.

      Plaintiff also saw several consulting professionals as part of the administrative process. In August 2006 she saw Dr. Syed Hasan and told him she suffered from Erb's palsy and Raynaud's disease[2] and experienced pain in her back and right shoulder and arm, numbness in her feet, depression, anxiety, migraines, and memory loss. She indicated the pain prevented her from attending to basic daily activities such as dressing herself and grooming, reported undergoing various diagnostic tests (such as an EMG, MRI, and x-rays) but did not have the records of such tests. Plaintiff also reported constant numbness in her hands, which precludes her using them, and that she experiences dizziness that causes her to fall. Upon examination, Dr. Hasan noted Plaintiff was sixty-four inches tall and weighed 248 pounds and exhibited no swelling or abnormalities in her extremities. Plaintiff had mild restrictions in flexing and rotating her lumbar spine, straight leg raising was mildly restricted, and she had mild to moderate

---

[1] The latter opinion was also expressed by Dr. Thornton.

[2] According to a website maintained by the Mayo Clinic, "Raynaud's disease is a condition that causes some areas of your body – such as your fingers, toes, tip of your nose and your ears – to feel numb and cool in response to cold temperatures or stress." It is a circulatory order marked by the arteries that supply blood to the skin being narrower than normal in the affected areas.
http://www.mayoclinic.com/health/raynauds-disease/DS00433 (last visited August 1, 2011).

restrictions in flexing her right (non-dominant) elbow.  However, "[t]here was no weakness on the upper or lower extremities," her gait was normal, and Plaintiff "had no difficulty in dressing or undressing or getting on or off the examination table today."  Dr. Hasan concluded Plaintiff could "work full time but she may need to take a rest for 10 to 15 minutes after sitting, standing or walking for prolonged periods of time.  She has no restriction in lifting or carrying with her left upper extremity [but] has difficulty lifting and carrying with the right upper extremity. . . . She has no difficulty speaking, hearing or comprehending or with fine manual activities involving the left hand."  R. at 287-91.

In April 2009, Plaintiff was referred to Dr. Corey Mayo at Advanced Physical Therapy and Sports Rehab.  Plaintiff reported that "her right shoulder/arm did not give her much trouble . . . until more recently.  She states that now she feels that she has just 'worn out' her right arm."  The pain allegedly extended to her hands.  However, "[m]edical records provided reveal no definitive history of a diagnosis of Erb's palsy and is only mentioned previously as a stated history in prior disability examination."  Dr. Mayo further noted there were no records or other diagnostic results confirming the presence of Erb's palsy,"[3] although she provided x-rays of her left (dominant) shoulder from January 2000 that were normal.  Upon examination, Plaintiff exhibited decreased range of motion in the right shoulder, but no other problems.  "there is no pain on palpation to the bilateral shoulders, elbows, wrists, or fingers.  There is no joint swelling noted."  Reflexes and strength were normal.  There were no difficulties with respect to

---

[3]According to a website maintained by the American Academy of Orthopaedic Surgeons, Erb's palsy "is a form of brachial plexus palsy" that "is often caused when an infant's neck is stretched to the side during a difficult delivery.  Most infants with brachial plexus birth palsy will recover both movement and feeling in the affected arm."  The condition is diagnosed by a pediatrician "based on weakness of the arm and physical examination."  The website indicates that in extreme cases damage in the affected arm will cause the arm to be smaller than the unaffected arm.  Otherwise, symptoms usually dissipate within two years of birth.  There is no suggestion that the effects of Erb's palsy "recur" or worsen as one gets older.  See http://orthoinfo.aaos.org/topic.cfm?topic=A00077#Symptoms (last visited August 1, 2011).

Plaintiff's lower extremities. The report indicates Plaintiff was sixty-five inches tall and weighed 268 pounds.

Dr. Mayo completed a Medical Source Statement indicating Plaintiff could frequently lift and carry ten pounds, sit for two hours at a time and six hours per day, and stand or walk two hours at a time and six hours per day. He indicated Plaintiff could only occasionally reach (overhead and otherwise) with her right hand, but could frequently engage in all other activity with her right arm/hand and could frequently engage in all activity with her left arm/hand and both legs/feet. R. at 343-53.

Plaintiff was referred for a psychological evaluation, which was also conducted in April 2009. Plaintiff told the psychologist (Dr. Jane Ruedi) that she slept a full eight hours, but during the day instead of at night. Plaintiff described her anxiety and depression in general, conclusory terms, but denied any limitations on her ability to function. Most of the problems Plaintiff described were physical in nature, as Dr. Ruedi observed on the first page of her Medical Source Statement. Nonetheless, Dr. Ruedi indicated Plaintiff's GAF score was 51 and her ability to respond appropriately to changes in the workplace and interact appropriately with the public, co-workers and supervisors was moderately affected by her mental impairments. R. at 326-32.

Plaintiff was examined by Dr. Robert Frick upon the arrangement of the Department of Family Services. Dr. Frick concluded that Plaintiff's GAF score was 35, but he did not document the illogical speech or major impairments (such as avoidance of friends or family) that would be associated with such a rating. R. at 355-58.

During the hearing,[4] Plaintiff testified she was diagnosed with Erb's palsey by a doctor in connection with a worker compensation claim, but there are no records confirming this diagnosis. R. at 24, 379. Her hands and feet swell and go numb and she can only stand for ten minutes at a time. R. at 30, 34-35. Plaintiff also testified that she is debilitated with depression at least three times a month, and during these bouts she stays in bed and just sleeps. She also testified the medicine she takes for

---

[4]An initial hearing was held on July 23, 2008. Another hearing was held on February 18, 2009.

5

headaches actually causes her to have migraines once or twice a month, and she still has stress headaches every other day. R. at 31. Plaintiff reported working at a gas station part-time on eight-hour shifts; she left that job not because she was physically incapable of performing the job but because "when I got nervous, I started messing up on the cash register." R. at 377. She told the ALJ that Dr. Thornton diagnosed her as suffering from Raynaud's Disease after her "hands started going numb and turning bright purple, like a dark purple," R. at 382, but there is no record of such an incident or diagnosis in the materials submitted from Dr. Thornton. She also claims to suffer from such incidents in her hands and feet on a daily basis, but the medical evidence did not support such a condition (or complaint by Plaintiff).

The ALJ elicited testimony from a vocational expert ("VE"). When asked to assume a hypothetical claimant with Plaintiff's education and work experience who could lift and carry twenty pounds occasionally and ten pounds frequently, stand and walk six hours a day, sit six hours a day, and who needed to avoid pushing and pulling with her non-dominant right upper arm, the VE testified such a person could perform their past work as a cashier, production assembler, cleaner, and filler. If the person also needed to avoid the use of vibrating hand tools, the filler position and approximately half of the assembler positions would be eliminated. R. at 40. All of these jobs were described as being at the light exertional level. In addition, such a person could perform sedentary jobs including hand packager, optical goods assembler, and order clerk. R. at 41.

The ALJ then asked the VE to add a requirement that the claimant "avoid repetitive or constant use of the hands," and the VE's answer was somewhat confusing. She started by stating that the only position left would be cashier, then said the "order clerk is still going to be available," but specified that the assembler positions would be excluded. R. at 41. The ALJ then "changed to occasional use of the hands," and the VE testified that such a person could not perform any of the sedentary jobs but could work as photocopying machine operator, a folding machine operator, or a collator machine operator. The ALJ explained that while the <u>Selected Characteristics of Occupations</u> suggested more than occasional use of hands was required for the broad

6

category of machine tending jobs, it was her opinion that some jobs within that broad category required no more than occasional use of hands. She also testified a person described in the hypothetical could work as a credit checker and surveillance system monitor. R. at 42-44.

Following the hearing, the ALJ submitted written questions to the VE to clarify some of her answers. Those answers reflected that the positions of cashier and order clerk required interacting with the public, and the position of surveillance system monitor "requires working as a team and interaction with co-workers and sueprvisors to report security matters." R. at 199-201.

The ALJ found Plaintiff had the residual functional capacity to stand or walk for six hours a day, sit for six hours a day, lift and carry twenty pounds frequently and ten pounds occasionally, needed to avoid pushing and pulling with her right upper arm, needed to avoid crawling, climbing, extreme temperatures, using vibrating machinery, or repetitive or constant use of her hands, and working overhead with her right arm. He also found Plaintiff "needed to avoid interacting with the public and interacting closely with co-workers and supervisors, such as working as a member of a team." R. at 15. He reached this decision after discounting Plaintiff's credibility based on her poor earnings (which evidenced a low motivation to work), inconsistencies between what she said at the hearing and what she told doctors (including the failure to report conditions as serious as those she testified about), the lack of supporting medical evidence, and Plaintiff's daily activities. The ALJ found Plaintiff could not perform her past work, but that she could perform unskilled light work "such as" a folding machine operator, photocopy machine operator, collator machine operator, and "sedentary occupations such as credit checker." R. at 18. In making this finding, the ALJ stated:

> The vocational expert testified that these jobs did not require more than occasional use of the hands. Pursuant to SSR 00-4p, the vocational expert's testimony is consistent with the information contained in the Dictionary of Job Titles and its companion publication, the Selected Characteristics of Occupations.

## II. DISCUSSION

"[R]eview of the Secretary's decision [is limited] to a determination whether the decision is supported by substantial evidence on the record as a whole. Substantial evidence is evidence which reasonable minds would accept as adequate to support the Secretary's conclusion. [The Court] will not reverse a decision simply because some evidence may support the opposite conclusion." Mitchell v. Shalala, 25 F.3d 712, 714 (8th Cir. 1994) (citations omitted). Though advantageous to the Commissioner, this standard also requires that the Court consider evidence that fairly detracts from the final decision. Forsythe v. Sullivan, 926 F.2d 774, 775 (8th Cir. 1991) (citing Hutsell v. Sullivan, 892 F.2d 747, 749 (8th Cir. 1989)). Substantial evidence means "more than a mere scintilla" of evidence; rather, it is relevant evidence that a reasonable mind might accept as adequate to support a conclusion. Gragg v. Astrue, 615 F.3d 932, 938 (8th Cir. 2010).

### A. Obesity

Plaintiff first contends the ALJ failed to properly consider the effects of her obesity. To the contrary, the ALJ specifically identified obesity as one of Plaintiff's severe impairments. R. at 12-13. Plaintiff's real argument seems to be that the ALJ did not ascribe any particular limitations to the severe impairment of obesity. However, the Court is not aware of any requirement that the ALJ specify a claimant's limitations on a condition-by-condition basis. This is unsurprising: doctors do not offer such opinions. They offer opinions based on their patient's condition as a whole, and the ALJ is similarly required to assess a claimant's RFC based on all of the limitations found to exist regardless of the medical cause for those limitations. The ALJ was not obligated to specify a correlation between Plaintiff's obesity and one or more specific limitations. The issue to be focused upon (and it will be discussed later in the opinion) is whether the RFC was supported by substantial evidence.

B.  Improper Reliance on VE's Testimony

Plaintiff next contends the case must be remanded because the ALJ wrote that the VE's testimony was consistent with both the Dictionary of Job Titles ("the DOT") and the Selected Characteristics of Occupations ("Selected Characteristics").  To put matters in context, there are actually two issues.  First, the VE explained that her testimony was at odds with these sources with respect to the light jobs of folding machine operator, photocopy machine operator, collator machine operator, but she explained the basis for her answer.  However, the ALJ incorrectly wrote that there were no such inconsistencies.  Second, Plaintiff contends the VE's testimony about the credit checker also conflicted with the DOT and Selected Characteristics because those sources suggest a credit checker requires frequent use of the hands.

With respect to the first issue, there is no doubt that the ALJ inquired about possible inconsistencies between the VE's testimony and the descriptions in the DOT and Selected Characteristics.  There is no also no doubt that the VE identified and explained such differences with regard to the machine operator positions.  The Court agrees with the Commissioner that the ALJ's erroneous written statement indicating there was no conflict is a deficiency in opinion writing that does not justify reversal. E.g., Hepp v. Astrue, 511 F.3d 798, 806 (8th Cir. 2008).  Here, the Record contains a viable explanation from the VE regarding the inconsistency, and no contrary evidence was presented.  Plaintiff attempts to contradict the VE's testimony by relying on excerpts from the DOT and the Selected Characteristics.  The effort does nothing more than establish what is already known: there was a discrepancy.  While the DOT descriptions control in most circumstances, they may be rebutted "with VE testimony which shows that 'particular jobs, whether classified as light sedentary, may be ones that a claimant can perform.'" Montgomery v. Chater, 69 F.3d 273, 276 (8th Cir. 1995) (quoting Johnson v. Shalala, 60 F.3d 1428, 1435 (9th Cir. 1995)); see also Young v. Apfel, 221 F.3d 1065, 1070 (8th Cir. 2000).

The second issue, related to the credit checker occupation, presents a closer question.  In context, the frequent use of the hands described in the DOT may apply to

9

handling pieces of paper – and it is not clear that the ALJ meant to exclude such jobs. There is no need to consider the matter further because the ALJ's decision with respect to the other positions provides a sufficient basis for concluding Plaintiff can perform jobs in the national economy.

## C. RFC

Plaintiff contends the ALJ did not properly assess her RFC. In large measure, Plaintiff's arguments address the form and not the content of the ALJ's opinion. The ALJ was entitled to discount Plaintiff's subjective complaints because they were largely not reported to doctors, contradicted by doctors' findings, or contradicted by Plaintiff's own statements to doctors. Plaintiff's suggestions to the contrary, the ALJ's RFC fairly incorporates all of the evidence he found credible.[5] The Court's recitation of facts demonstrates the substantial evidence supporting the ALJ's findings.

## III. CONCLUSION

Finding no error, and finding substantial evidence in the Record as a whole supports the ALJ's factual findings, the Court affirms the Commissioner's final decision denying benefits.

IT IS SO ORDERED.

/s/ Ortrie D. Smith
ORTRIE D. SMITH, SENIOR JUDGE
DATE: August 29, 2011      UNITED STATES DISTRICT COURT

---

[5]It must be remembered that Plaintiff is left-handed; therefore, doctors' references to limitations in her right shoulder were accurately described by the ALJ as restrictions in her non-dominant arm. No doctor suggested restrictions in her use of her left arm.